F I L E D
United States Court of Appeals
Tenth Circuit

AUG 8 2001

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SIERRA CLUB-BLACK HILLS
GROUP; AMERICAN WILDLANDS,
INC.; and FRIENDS OF THE BOW,
also known as Biodiversity Associates,

     Plaintiffs - Appellants,

v.

UNITED STATES FOREST SERVICE,
an administrative agency within the
U.S. Department of Agriculture, and
TOM L. THOMPSON, Deputy
Regional Forester and Regional
Reviewing Officer,

     Defendants - Appellees.

No. 99-1445

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 94-D-2273)**

---

Jack R. Tuholske, Missoula, Montana, for Plaintiffs-Appellants.

Tamara N. Rountree, Attorney, Department of Justice, Environment and Natural
Resources Division, Washington, D.C. (Lois J. Schiffer, Assistant Attorney
General, Department of Justice, Environment and Natural Resources Division,
Washington, D.C.; Stephen D. Taylor, Assistant U.S. Attorney, Denver, Colorado;
David C. Shilton and Steven K. Linscheid, Attorneys, Department of Justice,
Environment and Natural Resources Division, Washington, D.C.; Kenneth Capps,
U.S. Department of Agriculture, Of Counsel, Denver, Colorado, on the brief), for
Defendants-Appellees.

---

Before **EBEL**, **McKAY**, and **LUCERO**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

Multiple environmental groups challenged management plans approved by the U.S. Forest Service authorizing two commercial timber sales in the Norbeck Wildlife Preserve in the Black Hills of South Dakota. After exhausting their administrative remedies, the plaintiffs brought suit in federal district court alleging that the Forest Service failed to comply with both administrative law and the National Environmental Protection Act [NEPA], and, additionally, that the harvest plans violate the Norbeck Organic Act. The district court ruled against them and dismissed Plaintiffs' Complaint with prejudice. This appeal followed. We have jurisdiction over the final decisions of district courts under 28 U.S.C. § 1291.

Originally named the Custer State Park Game Sanctuary, the Norbeck Wildlife Preserve was created by Congress in 1920. The Forest Service currently manages approximately 28,000 of the Preserve's 34,873 acres.[1] The diverse geography ranges in elevation from 4,500 to 7,242 feet, providing habitat to

_____

[1]The Preserve consists of predominately public lands, but it contains some private lands.

-2-

multiple game animals, such as elk, deer, and mountain goats; over fifty bird species, including species of nuthatch and woodpeckers, the northern goshawk, ruffed grouse and Merriam's turkey;[2] brook trout and other fish species; and to various non-game animals.

The Forest Service endeavors to manage habitat for breeding, feeding, hiding, and resting for this myriad of animal species, while also optimizing vegetative diversity. Habitat management is a delicate venture. Successful management necessitates a precarious balancing of the environmental impacts occasioned by geographical features such as meadows, undergrowth, timber stands, roads, and waterflow. For example, some species are sustained by mature to old-growth timber stands, while others need early successional forest stages. After considering many countervailing factors, the Forest Service approved the timber harvest plans now at issue for the Needles and Grizzly areas of the Norbeck Preserve.

This is not the first time that timber harvests have been planned for the Norbeck Preserve. In 1927, the Forest Service developed a Master Plan for managing the Preserve, and regulated timber harvests were included. See Aplee.

_____

[2]We note that among those birds the pygmy nuthatch is listed by the state of South Dakota as Critically Rare. Also, owing to population concerns, the three-toed and black-backed woodpeckers and the northern goshawk are classified by the Forest Service as Sensitive Species. See Aplt. Br. at 5 with uncontested citation to the Administrative Record.

Supp. App. at 6. That Master Plan specified that timber cutting would be "without material interference with the game" and expressly reinforced that wildlife preservation remained the "primary purpose" and "dominant activity" of preserve management. Id. at 6-11. In 1948, Congress authorized mining within the Preserve and acknowledged that timber clearing was incidental to that use. 16 U.S.C. § 678(a). Substantial commercial timber harvests were proposed in 1973 and 1986, but, after lengthy administrative and court proceedings, neither proposal reached fruition. The course of those proceedings yielded a Final Supplemental Environmental Impact Statement (FSEIS) that forms the evidentiary basis for the current harvest plans.

The Forest Service does not assert that the 1927 Master Plan nor the 1948 mining exemption authorize the proposed timber sales from the Needles and Grizzly areas. Instead, the Service asserts that the comprehensive Black Hills National Forest Land and Resource Master Plan, approved in 1983, authorizes the current management plans, of which the timber sales are a part. The Service enacted the 1983 Plan pursuant to the National Forest Management Act [NFMA]. See 16 U.S.C. § 1604 et seq.[3] Accordingly, the 1983 Plan overtly effectuates the NFMA mandate to optimize overall wildlife, fish, and vegetative habitat diversity.

---

[3]Title 16 U.S.C. § 1604(f)(5) requires revision of management plans at least every fifteen years. The parties concede that modifications effective in the 1997 management plan do not affect the decisions at issue in this litigation.

See § 1604(g)(3)(B); 36 C.F.R. § 219.27(g).  Consequently, under the 1983 plan, the management emphasis for the Norbeck Preserve became the optimization of overall habitat capability, thus extending management decisions beyond the parameters of the Norbeck Organic Act.  See  Aplee. Supp. App. at 14 (1983 Plan).

Apart from the NFMA and its mandate to optimize overall diversity, the Norbeck Organic Act specifically designates the Norbeck Wildlife Preserve more narrowly "for the protection of game animals and birds and . . . as a breeding place thereof."  16 U.S.C. § 675.  Under the Norbeck Act, timber harvests are permitted in limited situations:  "[E]xcept where clearing is necessary in connection with mining operations, . . . no use of the surface of the claim or the resources therefrom . . . shall be allowed except under the national-forest rules and regulations . . . ."  16 U.S.C. § 678(a).  In this case, the district court upheld the agency's management plans after finding them in compliance with the rules and regulations of the National Environmental Policy Act [NEPA].  42 U.S.C. § 4321 et seq.

The record reveals that the proposed harvest plans will yield approximately 13.5 million board feet of timber from over 3,700 acres of the Preserve.  To facilitate those harvests, there will be an accompanying 32.9 miles of road construction.  It is not disputed that, besides other environmental impacts, the

harvests and road construction will significantly reduce the percentage of big-game hiding cover to as low as twenty-seven percent of the project area.[4]  The record reveals that the agency is aware the harvests and accompanying road construction will cause "wildlife disturbance," but the agency justifies the plans by relying on mitigation measures oriented toward overall habitat diversity.  Aplt. App. at 29 (Record of Decision).  Furthermore, the agency recognizes that the balancing of all interests "may be detrimental to the continued presence of some habitat specialists, especially species requiring larger tracts of forest or interior habitat conditions."  Aplee. Supp. App. at 56A (1992 FSEIS).  Notably, "habitat specialists" include bird species dependent on pine stands in mature and old-growth forest.  See id. at 44-45.  That grouping encompasses woodpeckers and goshawks, both of which have been classified as sensitive species based on their population statuses.  See supra note 2.  Again, the agency relies on the NFMA interest of overall plant and animal diversity to justify the fact that certain species might be compromised, including some already jeopardized.

Appellees argue that the Forest Service "has reasonably interpreted the Norbeck Act as permitting it to manage the Preserve for overall habitat and

---

[4]Appellant alleges that the Forest Service twice lowered the required Forest Plan standard for big game hiding cover from fifty percent of the project area "so that the Needles sale would not violate the agency's own protective standard." Aplt. Brief at 8-9.

vegetative diversity, recognizing a special emphasis on game animals and birds, but creating favorable habitat conditions for wildlife generally." Aplee. Br. at 42-43. In other words, Appellees have interpreted the Norbeck Act to be supplemental or subordinate to the NFMA. Appellees assert that we should defer to the agency's interpretation of its management mandate and in doing so imply that agency discretion extends to the determination of which among various statutes govern agency action.

Indeed, we defer to agency interpretation of congressionally delegated mandates. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 376-77 (1989) (emphasizing that deference is particularly appropriate when an interpretation implicates scientific and technical judgments within the scope of agency expertise). Deferring to an interpretation of a known but ambiguous mandate, however, is strikingly different than deferring to the determination of which among various statutes constitutes the mandate of Congress. We do not pay deference to an agency's interpretation of what law is applicable; in this case, that means we do not defer to the agency's interpretation of how one Act (NFMA) affects the scope of another (Norbeck Act). See Cascade Natural Gas Corp. v. F.E.R.C., 955 F.2d 1412, 1415 (10th Cir. 1992) (reiterating that court is "under no obligation to defer to the agency's legal conclusions"). In this case, we must first

-7-

decide whether and how other congressional acts, namely the NFMA and the NEPA, affect the Norbeck Act's special mandate.

Appellees assert that "this Court need not decide the relationship between the NFMA and the Norbeck Act because the Sierra Club's arguments in this case can be rejected based solely on the Norbeck Act." Aplee. Br. at 43 n.16. We disagree. The agency's consistent recitation and reliance upon "overall diversity" and other terms extraneous to the Norbeck Act make clear that the agency itself did not rely solely on the Norbeck Act in approving the commercial timber harvest plans. Appellees remark that "[t]his is not a case in which the Forest Service is balancing competing habitat needs of 'game animals and birds' on the one hand, against habitat needs of other wildlife species on the other." Id. Again, we disagree. The agency's record leaves no doubt that this is precisely that kind of balancing case. In the agency's words:

> Managing the Norbeck Wildlife Preserve to create this habitat diversity means balancing the conflicts between creating more edge and minimizing fragmentation. On the one hand, edges promote habitat and species richness, and favor many game and non-game species. On the other hand, those same edges (and the habitat fragmentation they create) may be detrimental to the continued presence of some habitat specialists . . . .

Aplee. Supp. App. at 56A. Indeed, we must determine whether the Norbeck Act allows that kind of overall interest balancing.

Our research confirms Appellants' assertion that no court has interpreted

-8-

the Norbeck Act, making this case one of first impression.  However, we clarify that we are not wholly without guidance because similar special-mandate statutes have been reviewed.  Reviewing the mining law of the Grand Canyon Game Preserve and making an explicit comparison to the Norbeck Preserve, one court reasoned that activities like mining or timber harvesting are not permitted in these special preserves unless they are expressly allowed by statute.  See Pathfinder Mines Corp. v. Clark, 620 F. Supp. 336, 341 (D.C. Ariz. 1985).  In cases more recent and more directly on point, environmental groups have litigated proposed timber sales in the Ozark National Forest.  See Kuff v. United States Forest Serv., 22 F. Supp. 2d 987 (W.D. Ark. 1998); Gregson v. United States Forestry Serv., 19 F. Supp. 2d 925 (E.D. Ark. 1998).  Although these cases do not resolve the final question we address in this appeal, they are instructive to the extent that they explain the connections between the NEPA, the NFMA, and the management of preserves governed by special mandates.

Without further discussion, we agree with these previous cases that the "NEPA itself does not mandate particular results but simply prescribes the necessary process."  Kuff, 22 F. Supp. 2d at 989 (citing Inland Empire Public Lands Council v. United States Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996), and Simmons v. United States Army Corps of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997)).  We also agree that the Forest Service may treat the NFMA as a

"substantive statute under which the Forest Service is acting" even in the management of specially designated preserves. Kuff, 22 F. Supp. 2d at 989. It is conceivable that in many cases, and hopefully most cases, the NFMA mandate to preserve overall diversity will work in concert with the more specific mandate of a special preserve. The question we must address, however, is which statute controls when the intersection of two or more mandates results in compromising a specifically applicable statute. In particular, we must resolve whether the broad overall diversity standards of the NFMA can be interpreted to overbalance and thereby effectively negate the specific game animal and bird duty imposed by the Norbeck Act.

It is a "fundamental tenet of statutory construction that a court should not construe a general statute to eviscerate a statute of specific effect." State Bank of S. Utah v. Gledhill (In re Gledhill), 76 F.3d 1070, 1078 (10th Cir. 1996) (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992)). The provisions of the NFMA apply generally to the 191 million acres of National Forest System, but there are a collection of special preserves with specific management mandates extraneous to the NFMA. See 16 U.S.C. §§ 671-689. These preserves comprise less than .05 percent of the National Forest System. In this limited context, we cannot apply the NFMA mandate in a way that effectively abolishes the specific statutory mandates Congress has established. That is the law even if reason and

equity support a different conclusion. See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 194 (1978). Accordingly, we hold that the Norbeck Organic Act governs the management of the Norbeck Preserve, and management plans must comply with its specific mandate.

Given the record before us, the end result of overall diversity does not allow us to assume that the timber harvest plans will protect game animals and birds. There are scattered concessions throughout the record that, although overall diversity will be enhanced, the harvests and road construction will in fact create wildlife disturbances and will have deleterious effects on certain species. Content that proposed harvest plans optimize overall diversity (including vegetative, fish and non-game life), the agency did not specify what it meant by "disturbance" and "deleterious." See Aplt. App. at 29 and Aplee. Supp. App. at 56A. It is significant that some of these overbalanced species (birds) have populations already classified as sensitive. Cf. Wyoming Farm Bureau Fed'n v. Babbitt, 199 F.3d 1224, 1237 (10th Cir. 2000) (holding that the Endangered Species Act does not countenance a management plan that undermines the recovery of threatened and endangered species). We might eventually confront the question of whether it is acceptable management practice to favor overall vegetative and animal diversity even at the expense of rare species of plants or animals. At present, however, as a matter of statutory interpretation, we hold that

the anticipated deleterious effects cannot be answered by general reliance on the NFMA's broader mandate to protect overall diversity because the Norbeck Act's specially designated species (game animals and birds) might drop out in such a balancing of collective interests. In light of the Norbeck Act, we cannot sustain harvest plans that favor vegetative, fish and non-game animal life if they fail to protect game animals and birds, even if optimal diversity is served. The law requires a more specific analysis.

The plain language of the Norbeck Act requires the protection of game animals and birds, not the overall protection of all plant and animal species. See Sundance Assocs., Inc. v. Reno, 139 F.3d 804, 808 (10th Cir. 1998) (holding that, notwithstanding other ambiguities, plain language of statute established a group possibly subject to its requirements). Appellees counter that "protection" is an ambiguous term requiring agency interpretation. We note that the agency did not address whether there are other available habitats for the at-risk rare birds, and we would normally require that type of specific finding with respect to the protection of a rare species. In any event, we agree that there is ambiguity about what "protection" ultimately entails, but hold here that the ambiguity does not extend to the object of protection. On that specific point, game animals and birds are the specially designated species and must be "protected"–not compromised–in a

balancing of interests.[5]

We restate that we are not impinging agency discretion by directing the Forest Service to reconsider its harvest plans in light of the narrow parameters established by the Norbeck Act. Our holding is premised simply on the fact that the Norbeck Act, unless modified by Congress, contains a special mandate that must be given full force. That is true even if the Norbeck Act's narrow mandate to protect game animals and birds prevents maximization of other mandates, namely, the NFMA mandate to preserve overall diversity. Cf. Sierra Club v. Espy, 38 F.3d 792, 798-800 (5th Cir. 1994) (recognizing that required substantive decisions may constrain the ability to maximize the mandate of NFMA). The Forest Service can continue to establish management plans under both the Norbeck Act and the NFMA, but the NFMA mandate must be supplemental and

---

[5]Admittedly, that language is potentially ambiguous in the sense that "game animals and game birds" are not necessarily the same objects of protection as "game animals and birds." Additionally, protection of populations differs from protection of individual animals. However, because the agency justified its plans pursuant to broader NFMA principles, it did not address those specific interpretive questions and we leave them for the agency to address in the first instance. The dissent misses the mark with its criticism on this point. Ambiguity in the Norbeck Act does not justify the agency's protection of vegetative life, fish species and non-game animals to the possible detriment of game animals and birds. The ambiguity is contained and limited by that phrase, "game animals and birds." On this record, the agency's interpretation is broad enough to tolerate harm done to game animals and birds in pursuit of protecting plant life, fish, and non-game animals. For that reason, the agency's interpretation is patently contradictory to the specific congressional mandate.

may not diminish (through balancing) the more specific mandate of the Norbeck Act.

During our careful review of the record, we have observed that because the agency paid special attention to game animals and birds, there is room to argue that the harvest plans might, in fact, satisfy the demands of the Norbeck Act. Conversely, as we have pointed out, the record also gives reason to believe that the timber harvest plans fail to satisfy that directive. In any event, we recognize that the actual effect of harvest plans on specified habitats is the kind of scientific determination for which we should not substitute our judgment in the place of a clear determination by an agency with specialized expertise. See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983). When the agency record is inadequate, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). We find this record inadequate because the agency justified its plans against a standard that authorizes management practices that would not be authorized by the controlling Norbeck Act. Contrary to Appellees' assertion, we hold that as a matter of law the NFMA is supplemental or subordinate to the specific mandate of the Norbeck Act.

It is clear to us that the agency approved the harvest plan because it fulfilled the NFMA goal of overall diversity. Certain bird species, some of them

already rare, might have dropped out in that analysis.  For the harvest plans to be consistent with law, they must, nonetheless, satisfy the Norbeck mandate. We cannot assume that to be true simply because overall diversity has been optimized. On remand, the agency must justify the proposed timber harvests not by showing that optimal diversity is served generally, but by showing specifically that game animals and birds are protected.

Accordingly, we REVERSE and REMAND for further proceedings.

99-1445, <u>Sierra Club v. United States Forest Service</u>
**EBEL, Circuit Judge, dissenting.**


For over a century, humans have suppressed fires and other natural, destructive forces in the Norbeck Wildlife Preserve. <u>See</u> Aplee. Supp. App. at 44. As a result of this artificial, human interference, the Preserve has been transformed from a wilderness area with a variety of habitats and wildlife to a place dominated by mature- to old-growth ponderosa pine. <u>See</u> <u>id.</u>. Whereas before, an abundant diversity of aspen, spruce, and pine flourished amidst meadows, streams, and rock formations, now the Preserve harbors a monoculture of older ponderosa pine. <u>See</u> <u>id.</u> at 47 ("Ponderosa pine is the dominant species in Norbeck Wildlife Preserve, constituting 92 percent of habitat. [In 1992,] 82 percent of the ponderosa pine in Norbeck [was] in a mature condition."); <u>id.</u> at 21 ("National Forest land in Norbeck lacks habitat diversity. The dominant vegetative type is mature ponderosa pine growing in dense, homogenous stands of 150 acres or more. There is little diversity in either tree species or the ages and sizes of the existing trees."). Prior to human interference, seedlings, saplings, and mature trees of various species provided a tapestry of canopies which in turn allowed for an assortment of different plants and shrubs to grow beneath the trees. <u>See</u> <u>id.</u> at 44. The unbroken, closed, single-level canopy of mature ponderosa pine forests blocks sunlight and is steadily choking off the grasses, flowers, and bushes which used to grow on the forest floor of Norbeck. <u>See</u> <u>id.</u>

The natural diversity of plants, shrubs, and trees supported a diversity of wildlife. As the majority acknowledges, different wildlife species require different, often conflicting types of habitat: "[S]ome species are sustained by mature to old-growth timber stands, while others need early successional forest stages." Slip op. at 3. Compare Aplee. Supp. App. at 25 (stating that elk and deer need open areas and young pine stands) with id. at 53 (indicating that northern goshawks and northern three-toed woodpeckers need older tree stands). Consequently, the decades of artificial suppression of the natural growth and decay in Norbeck have transformed it from a wilderness that used to support an abundant variety of animals, birds, and fish to a place suited to the few species that can survive in mature- to old-growth ponderosa pine forests.[1]

Modern forest management science has recognized that humans can alter the delicate balance of an area like Norbeck both by cutting all the trees, turning a diverse wilderness into a meadow, and by suppressing all the fires or vegetative diseases, turning a wilderness into an unbroken forest. Here, the Forest Service, employing this modern understanding, is attempting to restore wildlife diversity to the Preserve by restoring habitat diversity.

---

[1]Catastrophic fires and epidemics are two more dangers to the homogenization of Norbeck. See Aplts. App. at 28.

As laudable as this goal may be, the majority is correct to insist that the Forest Service's decisions with regard to the Needles and Grizzly areas must comply with the Norbeck Act.[2] The majority disapproves of these decisions because it believes that the Forest Service has failed to develop an adequate record to show that the Norbeck Act's mandate to protect game animals and birds has been satisfied. See slip op. at 14-15. The majority's two overriding concerns are that (1) the Forest Service subordinated the Norbeck Act to the NFMA, see slip op. at 14-15, and (2) the proposed plans "patently contradict" the Norbeck Act's mandate, see id. at 13 n.5.

I do not share the majority's concerns. I respectfully dissent because I believe the Forest Service has demonstrated compliance with all the statutes that apply, including the NEPA, the NFMA, and the Norbeck Act. Unlike the majority, I find the Act rife with ambiguity and the Forest Service's decisions reasonable interpretations of it. Therefore, I believe Chevron deference requires us to affirm the district court's approval of these decisions.

---

[2]While discussion has centered on the logging and timber sales associated with the Needles and Grizzly decisions, the majority is correct to note, see slip op. at 4, that commercial logging is only a part of the overall management plans for these areas. The plans also include prescribed fire, noncommercial logging, road construction and obliteration, and erosion control. See Aplts. App. at 49-64 (Needles Decision Notice), 65-75 (Grizzly Decision Notice).

A. <u>Overlapping Statutes</u>

The Norbeck Preserve is governed by several overlapping statutes, <u>e.g.</u>, the NEPA, the NFMA, and the Norbeck Act, each of which must be complied with before any decision affecting the Preserve may be implemented legally.[3] At times the majority acknowledges this. <u>See</u> slip op. at 9-10 (stating that the NEPA applies to Norbeck); <u>id.</u> at 10 (same for the NFMA); <u>id.</u> at 11 (holding that management plans must comply with the specific mandate of the Norbeck Act). At other times, however, the majority seems to set up an "either-or" proposition: Either the NFMA or the Norbeck Act applies, but if the former does then the latter cannot. <u>See</u> slip op. at 7 (discussing "which among various statutes" govern agency action); <u>id.</u> at 8 (disagreeing with the Forest Service's assertion that its decisions comply with all the overlapping statutes, including the Norbeck Act, and chiding the Service for "not rely[ing] solely on the Norbeck Act"); <u>id.</u> at 10 (asking whether the NFMA can "overbalance and thereby effectively negate" the Norbeck Act). I believe this is a false dichotomy. There is no inherent reason to think that the Forest Service's reliance on the NFMA necessarily violates the Norbeck Act.

---

[3]The environmental groups which challenged the Needles and Grizzly decisions by bringing this lawsuit agree that Norbeck is governed by overlapping statutes. <u>See</u> Appellees Opening Brief at 31 (agreeing that "Norbeck, as part of the National Forest System, is governed by multiple management statutes, including NFMA").

These instances of characterizing the case in "either-or" terms brings to light the majority's fundamental concern, and the question at the heart of this case: whether the Forest Service's goal of "optimiz[ing] overall wildlife, fish, and vegetative habitat diversity," slip op. at 5 (citing the NFMA), is permissible given the Norbeck Act's mandate of preserving Norbeck "for the protection of game animals and birds, and . . . as a breeding place therefor," id. (quoting the Norbeck Act, 16 U.S.C. § 675). The majority concludes that the goal is "patently contradictory" to the Act's mandate. See slip op. at 13 n.5. I disagree given the Act's ambiguity.

B.  Ambiguities in the Norbeck Act

I agree with the majority's conclusion that, as the most specific of the overlapping statutes that apply to the Preserve, the proposed management plans must comply with the "specific mandate" of the Norbeck Act. See slip op. at 10-11. I disagree, though, with the majority's further conclusion that the Act's language "contain[s] and limit[s]" the Forest Service's discretion in such a way as to disallow the proposed plans for Norbeck. See id. at 13 n.5. My reason, again, is that I find the Act ambiguous on numerous levels. The surrounding statutory context eliminates some of the ambiguity, but it does so in favor of the Forest Service's interpretation.

-5-

To begin with, "protection of game animals and birds" is ambiguous in that it may mean either protecting individual animals[4] or protecting populations of animals.[5] The latter reading seems more plausible because §676 permits the Secretary of Agriculture to issue regulations to govern "hunting, trapping, killing, or capturing of game animals and birds" on the Preserve. See 16 U.S.C. §676. Indeed, protecting populations of animals may in fact require injuring or killing individual animals. For example, the Forest Service would "protect" a herd of deer living in the Preserve if it killed one, sick member of that herd before it was able to spread a contagious disease to the others.

Second, the ambiguity the majority notes in the term "protection," see slip op. at 12-13, is drained of some of its ambiguousness – but, again, in favor of the Forest Service's plans to allow logging – by §678a, which, as the majority mentions, expressly permits timber harvests in limited situations, see slip op. at 5. Thus, the term "protection" must permit some harm to some animals, i.e. it allows some amount of "wildlife disturbances" and "deleterious effects on certain species." See slip op. at 11. How much harm is too much is a judgment call best left to wildlife experts, not this court. See Marsh v. Or. Natural Res. Council, 490

_____

[4]Here, I use "animals" broadly to include all types of "game animals and birds," whatever this phrase means.

[5]The majority seems to acknowledge this ambiguity in footnote five. See slip op. at 13 n.5.

U.S. 360, 377 (1989) (explaining that courts "must defer to the informed discretion of the responsible federal agencies" on questions requiring "a high level of technical expertise"). These experts – from the Forest Service and the broader scientific community – participated in the notice-and-comment process leading up to the adoption of the management plans at issue. See infra at 12-13.

Consequently, the phrase "the protection of game animals and birds" is best read as directed at game animal and bird populations, not at individual animals or birds, and as permitting, not forbidding, some wildlife disturbances.

The third, and most telling, ambiguity of §675's phrase "protection of game animals and birds," however, resides in the object of protection, i.e., in discerning what exactly is to be protected. If the phrase "game animals and birds" means "game animals and game birds," then the Forest Service's goal of achieving the "greatest overall benefit to wildlife" could be in tension with the limitation imposed by the Act, because non-game bird species may benefit at the expense of game birds.[6] In contrast, the tension created by "game birds" is reduced if we read "game animals and birds"[7] to mean "game animals and game

_____

[6]The same tension would exist if we concluded that "game animals and birds" meant "game animals and non-game birds."

[7]Given the majority's concern for the pygmy nuthatch, the three-toed and black-backed woodpeckers, and the northern goshawk – none of which are "game birds" – it appears the majority reads this phrase as either "game or non-game birds" or "non-game birds." See slip op. at 3 n.2, 6.

-7-

and non-game birds."  Seeking the greatest good for all bird species in the Preserve is entirely consistent with this latter reading.

Another ambiguity in the object of protection comes to light when one considers that to remain viable, different species require different, often conflicting types of habitat. See slip op. at 3 ("Successful management necessitates a precarious balancing of the environmental impacts occasioned by geographical features such as meadows, undergrowth, timber stands, roads, and waterflow.  For example, some species are sustained by mature to old-growth timber stands, while others need early successional forest stages.").  While the Norbeck Act mandates "protection of game animals and birds," it does not specify which species are to be preferred over which others when conflicts in habitat occur, as they inevitably will.  For example, if the Forest Service refuses to thin a mature forest on the ground that it must "protect" the three-toed woodpecker and northern goshawk, then it is, by its inaction, detrimentally affecting white-tailed deer, elk, ruffed grouse, and mountain goats who benefit from more meadows and edges for foraging. See Aplee. Supp. App. at 53.  While the Forest Service's experts, after consulting with others, concluded that the proposed plans will maximize the benefit to all species in Norbeck, see id. at 24 (chart comparing optimum habitat for various species); id. at 37 ("Optimum habitat capability will be achieved for pygmy nuthatch, goshawk, and northern

three-toed woodpecker by all [management] alternatives."), the majority's decision reinstates the status quo, which benefits only species which can survive in old-growth ponderosa pine forests.

I find it surprising that the majority expressly rejects as unambiguous the object of protection under the Act. See slip op. at 13 (holding that "the ambiguity [in the Act] does not extend to the object of protection"). It is particularly surprising because in a footnote immediately after this rejection, the majority acknowledges several of the ambiguities I just identified.[8] The majority attempts to overlook these ambiguities by arguing that "because the agency justified its plans pursuant to broader NFMA principles, it did not address those specific interpretive questions and we leave them for the agency to address in the first instance." Slip op. at 13 n.5.

The majority fails to persuade me with this argument for two reasons. First, despite the majority's characterization, the Forest Service did not ignore the Norbeck Act or argue that the NFMA's goal legitimately "overbalanced" the Act. Rather, it contended that its decisions fully complied with the Act given its ambiguity. See slip op. at 8 (citing the Forest Service's brief); see also Forest

_____

[8]For example, the majority admits that the phrase defining the object of protection – "game animals and birds" – is "'potentially ambiguous' in the sense that 'game animals and game birds' are not necessarily the same objects of protection as 'game animals and birds.'" Slip op. at 13 n.5.

-9-

Service brief at 27-28 (summarizing its Chevron argument); Aplts. App. at 49, 55 (justifying Needles decision using the Act); id. at 65, 70 (same for Grizzly decision). Thus, the Forest Service did not "justify its plans pursuant to broader NFMA principles," but argued its plans were justified based on the application of all the applicable statutes, including the Norbeck Act. Second, the majority's reasoning here strikes me as another attempt to rely on a false "either-or" dichotomy. So long as the Forest Service's decisions are consistent with every statute that applies, we need not be concerned that the Forest Service adopted the "overall wildlife diversity" goal from the NFMA, that it did not rely solely on the Norbeck Act, or that it relied more heavily on the NFMA.

Given the past one hundred years of artificial, human fire suppression, the Preserve now provides an overabundance of habitat for some "game animals and birds" but for others it is becoming an unsuitable place for shelter, feeding, and breeding. See Aplee. Supp. App. at 25. It seems to me that the Act's flat mandate "to protect game animals and birds and provide a breeding place therefor" is best fulfilled by the Forest Service's goal of providing "optimum habitat diversity" so that the greatest good comes to the greatest number of species populations. Ultimately, of course, what interpretation I (or the majority) think best fulfills the Act does not matter. Chevron requires a court to defer to agency interpretations unless "manifestly contrary to the statute." United States v.

Mead Corp., 533 U.S. __, 121 S. Ct. 2164, 2171 (2001). Thus, the final question I must address is whether Chevron applies.

C. *Chevron* or *Skidmore* Deference

In order to determine how much deference we give to the Forest Service's decisions to permit timber harvesting in the Needles and Grizzly areas, we must look to the Supreme Court's recent pronouncement in Mead Corp. There, the Court teaches that courts give agency interpretations Chevron deference if "Congress delegated authority to the agency generally to make rules carrying the force of law, and the agency interpretation claiming deference was promulgated in the exercise of that authority." Mead Corp., 121 S. Ct. at 2171; see also Chevron U.S.A. Inc. v. Natural Res. Defendant. Council, Inc., 467 U.S. 837 (1984). If an interpretation does not qualify for Chevron deference, then we still must consider whether it merits some amount of deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944). See Mead Corp., 121 S. Ct. at 2175.[9]

In this case, both the Black Hills National Forest Land and Resource Master Plan of 1983 ("the Black Hills LRMP") and the Needles and Grizzly

---

[9]The "measure of [Skidmore] deference . . . var[ies] with circumstances, [like] the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." Mead Corp., 121 S. Ct. at 2171.

decisions are entitled to <u>Chevron</u> deference.  As the majority correctly noted, the

NFMA is the "substantive statute under which the Forest Service is acting." Slip

op. at 10; <u>see also</u> Appellees Opening Brief at 31 (agreeing that "Norbeck, as part

of the National Forest System, is governed by multiple management statutes,

including NFMA").  When it enacted the NFMA, Congress authorized and

instructed the Secretary of Agriculture to "develop . . . land and resource

management plans for units of the National Forest System," 16 U.S.C. §1604(a).

Regulations passed pursuant to the NFMA establish a two-stage approach

to forest planning. <u>See</u> <u>Inland Empire Pub. Lands v. United States Forest Serv.</u>,

88 F.3d 754, 757 (9th Cir. 1996); <u>see also</u> 36 C.F.R. §219.10 (2000).  In the first

stage, the Forest Service develops a proposed land and resource management plan

("LRMP"), together with a draft and final environmental impact statement

("EIS"). <u>See</u> <u>Inland Empire</u>, 88 F.3d at 757; <u>see also</u> 36 C.F.R. §219.10(a) & (b)

(2000).  In this case, the Black Hills LRMP is the fruit of the first stage of the

process. <u>See</u> Aplee. Supp. App. at 9-16 ("1983 Forest Plan").  "Once the LRMP

is approved, direct implementation of the LRMP occurs at a second stage, when

individual site-specific projects are proposed and assessed.  These site-specific

projects must be consistent with the stage-one, forest-wide plan." <u>Inland Empire</u>,

88 F.3d at 757 (citations and alterations omitted); <u>see also</u> 36 C.F.R. §219.10(e)

(2000) ("Plan Implementation").  The Needles and Grizzly decisions are site-

specific projects that occurred as part of stage two. See Aplts. App. at 49-64

("Needles Decision Notice") and 65-75 ("Grizzly Decision Notice"). As required

by NFMA, before decisions were made at both stages, notice-and-comment

occurred. See id. at 51, 66-67 (describing the public involvement preceding the

Needles and Grizzly decisions); see also 16 U.S.C. §1612 (requiring "adequate"

notice and comment opportunities); 36 C.F.R. §219.10(b) (2000) (same). Thus,

since the Needles and Grizzly decisions were made pursuant to authority

delegated to the Forest Service by Congress, we must afford them Chevron

deference.

Given the ambiguity of the Norbeck Act, I conclude the Forest Service's

interpretation is far from being "manifestly contrary" to that Act. Therefore, I

believe this court should affirm the district court's decision to approve the Forest

Service's interpretation of the Norbeck Act.

D. Final Concerns

Importantly, neither the majority nor the Sierra Club itself expressly

alleges that the proposed timber harvesting would threaten the viability of any

populations living in the Preserve. Cf. 36 C.F.R. §219.19 (2000) (requiring the

Forest Service to maintain viable populations in planning areas and defining

"viable population" as "one which has the estimated numbers and distribution of

-13-

reproductive individuals to insure its continued existence is well distributed in the planning area"). While the viability of populations that rely on meadows and edges is threatened under the status quo – because the ponderosa pine stands continue to grow larger and older, see Aplee. Supp. App. at 48 ("Habitat conditions for all wildlife species, except those dependent on mature forests or old growth, is declining."), permitting timber harvests would not threaten the viability of any population in the Preserve. The Forest Service specifically found that none of the forest management alternatives that it considered would have any effect on species listed as "threatened" or "endangered" under the Endangered Species Act. See id. at 65. Indeed, the Forest Service further found that the forest management plan it adopted would "significantly improve wildlife habitat diversity and capability," ultimately resulting in overall improvement for wildlife. See Aplt. App. at 29-30.

It is apparent that the majority is troubled by the possible effects logging would have on certain bird species "dependent on [large, unfragmented] pine stands in mature and old-growth forest." Slip op. at 6 (citing Aplee. Supp. App. at 56A); see also id. at 3 n.2, 15. The Forest Service, however, expressly accounted for this concern in its plan: "Because the Black Hills is still predominately forested, the Forest Service believes that a balance between edge and interior habitats can be achieved to provide the desired habitat diversity [for

-14-

these bird species as well as for other species] within the Norbeck Wildlife Preserve." Aplee. Supp. App. at 57. <u>Chevron</u> forbids this court from substituting its own judgment on such a technical matter for that of agency experts, absent some reason demonstrable in the record. The majority has not demonstrated any such reason.

**CONCLUSION**

Under <u>Chevron</u>, our review of Forest Service decisions managing a portion of our nation's national forests is limited to the legal question of whether the Forest Service's interpretation is, given the record, manifestly contrary to the Norbeck Act. This narrow scope of review is appropriate because, as the majority acknowledges, "[h]abitat management is a delicate venture." Slip op. at 3. The majority's decision delays even longer the implementation of forest management techniques the Forest Service considers necessary. <u>See</u> Aplts. App. at 49 ("The Needles area has not received any significant vegetative treatment in the last 25 years."); <u>id.</u> at 65 ("The Grizzly Project Area . . . has received little vegetative treatment in the last 30 years."). Given the Norbeck Act's ambiguity, I conclude that <u>Chevron</u> requires us to affirm.